**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FIRST BUSINESS SPECIALTY FINANCE, LLC, a Wisconsin limited liability company, | ) ) | Case No. |
| *Plaintiff,* | ) | |
| v. | ) | Hon. |
| MARCUS TREIBER, individually, ERYN APPELL, individually, AND EMT HOLDINGS LLC, a Nevada limited liability company, | ) ) )) | |
| *Defendants.* | ) | |

## VERIFIED COMPLAINT AND REQUEST FOR PREJUDGMENT RELIEF

Plaintiff FIRST BUSINESS SPECIALTY FINANCE, LLC, a Wisconsin limited liability company ("FBSF"), by and through its attorneys, Krieg DeVault LLP, for its Verified Complaint and Request for Prejudgment Relief against defendants MARCUS TREIBER, an individual, ERYN APPELL, an individual, and EMT HOLDINGS LLC, a Nevada limited liability company ("EMT"), (collectively, "Defendants"), states as follows:

### Parties, Jurisdiction, and Venue

1. FBSF is a Wisconsin limited liability company, with its headquarters and principal place of business located in Des Plaines, Illinois.

2. As a limited liability company, FBSF is a citizen of the states of each of its members. FBSF's sole member is First Business Bank Corp., which is a state-chartered Wisconsin bank with its principal office in Wisconsin and is a wholly owned subsidiary of First Business Financial Services, Inc., which also has its headquarters and principal place of business in the state of Wisconsin. Hence FBFS is a citizen of the state of Wisconsin.

3. Defendant EMT is a Nevada limited liability company with its principal place of business at 17131 Silver Charm Place, Leesburg, VA 20176. As a limited liability company, EMT is a citizen of the states of each of its members, consisting solely of Marcus Treiber and Eryn Appell.

4.   Marcus Treiber is the Chief Executive Officer ("CEO") of EMT and is an individual citizen of the State of Virginia who, on information and belief, resides at 17131 Silver Charm Place, Leesburg, VA 20176.

5.   Eryn Appell is an individual citizen of the State of Virginia who, on information and belief, resides at 17131 Silver Charm Place, Leesburg, VA 20176. Eryn is the Chief Operating Officer ("COO") of EMT and the wife of Marcus Treiber.

6.   This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under RICO, 18 U.S.C. § 1962.

7.   This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over all other claims raised in this action because they are so related to the federal claims that they form part of the same case or controversy.

8.   This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because each defendant is a citizen of different states than FBSF, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.   Venue in the Northern District of Illinois is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to FBSF's claims occurred in this District; and (b) because all defendants consented through Section 30 of the Factoring Agreement to jurisdiction of any state or federal court sitting in the State of Illinois; and (c) Marcus Treiber consented to the jurisdiction of this Court pursuant to Section 6 of the Guaranty.

## Allegations Common to All Counts

### A.  The Factoring Business

10. FBSF is in the factoring business, in which it acts as a "Factor" or "Purchaser" and contracts to buy commercial accounts receivable ("Accounts") from a "Factoring Client."

11. "Accounts" as used herein and in the factoring industry has the same meaning as identified

2

by the State of Illinois Uniform Commercial Code, 810 ILCS 5/9-101 *et. seq.,* (hereinafter "UCC"), which is:

> a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under a charter or other contract, (vii) arising out of the use of a credit or charge card or information contained on or for use with the card, or (viii) as winnings in a lottery or other game of chance operated or sponsored by a State, governmental unit of a State, or person licensed or authorized to operate the game by a State or governmental unit of a State. 810 ILCS 5/9-102(a)(2).

12. The Factoring Client's customers, to whom the Factoring Client has provided goods or services and who owe on Accounts, are identified in the factoring industry as "Account Debtors," which as defined by § 9-102(3) of the UCC is "a person obligated on an Account…"

13. When a Factor purchases Accounts, it advances funds to the Factoring Client for the purchased Accounts, the Factoring Client invoices its Account Debtors, the Account Debtors are provided "Notices of Assignment" directing them to pay the Factor, and the Factor collects directly from those Account Debtors, i.e. the Factoring Client's customers.

## B. EMT's Sale of Accounts to FBSF

14. In and around the summer of 2025, EMT, by representations of Marcus Treiber, represented itself to FBSF as a company that provides investigative services, location systems, tactical communications, enterprise IT and cloud services, located in Leesburg, Virginia, serving Account Debtors who have purchased its services. The communications to FBSF were transmitted by telephone and by electronic means by emails between Marcus Treiber and FBSF.

15. Induced by Defendants Marcus Treiber's and EMT's representations, FBSF entered into an Agreement for Sale and Purchase (the "Factoring Agreement") to purchase Accounts from EMT, which Marcus Treiber and Eryn Appell signed and returned to FBSF by electronic mail on or about August 8, 2025, the date reflected on the Original Factoring Agreement.

16. A true and correct copy of the Factoring Agreement is attached hereto as ***Exhibit 1*** and is incorporated herein.

17. Marcus Treiber and Eryn Appell are both "Managing Members" of EMT and each executed the Factoring Agreement in their capacities as Members of EMT. (***Ex. 1***-Factoring Agreement, p. 21):

18. Through the Factoring Agreement, EMT agreed to sell and FBSF agreed to purchase "all of [EMT's] Accounts" (the "EMT Accounts"). (***Ex. 1***-Factoring Agreement, p. 6, § 2).

19. EMT also granted FBSF, as security for all present and future obligations of EMT under the Factoring Agreement, a continuing first priority and exclusive security interest in the assets of EMT, including all Accounts, contract and contract rights, and all proceeds thereof (the "EMT Collateral"). (***Ex. 1***-Factoring Agreement, p. 9, § 8).

20. The Factoring Agreement requires that EMT provide the following reports monthly on the 15th working day of the month for the prior calendar month: (a) Accounts Receivable Aging; (b) Accounts Payable Aging; and (c) bank statements. (***Ex. 1***-Factoring Agreement, p. 12, § 13.2).

21. The Factoring Agreement requires that EMT provide the following financial statement report monthly, no later than twenty-five (25) days after each month's end for the prior calendar month: (a) Balance Sheet; (b) Profit and Loss Statement; and (c) tax returns upon the request of FBSF. (***Ex. 1***-Factoring Agreement, p. 12, § 13.3).

22. Through the Factoring Agreement, EMT, as Seller, represented and warranted, among

other warranties, that records and documents provided to FBSF were true and accurate.

13.3    Seller agrees to furnish, no later than twenty-five (25) days after each month's end, a financial statement package consisting of a balance sheet and a profit and loss statement, which shall be true, accurate and correct in all respects. Seller shall furnish its tax returns upon the request of Purchaser.

(*Ex. 1*-Factoring Agreement, p. 14, § 13.3).

23.  The Factoring Agreement gave FBSF the right to examine and verify EMT's financial records at any time:

13.4    From time to time as requested by Purchaser, at the sole expense of Seller, Purchaser or its designee shall have access, during reasonable business hours if prior to an Event of Default and at any time if on or after an Event of Default, to all premises where Collateral is located for the purposes of inspecting (and removing, if after the occurrence of an Event of Default) any of the Collateral, including Seller's books and records, and Seller shall permit Purchaser or its designee to make copies of such books and records or extracts therefrom as Purchaser may request. […] Seller hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Purchaser at Seller's expense all financial information, books and records, work papers, management reports and other information in their possession relating to Seller.

(*Ex. 1*-Factoring Agreement § 13.4).

### C.  The Guaranty

24. Incorporated within the Factoring Agreement is a Validity Guaranty executed by Marcus Treiber (the "Guaranty"), a true and accurate copy of which is attached hereto as *Exhibit 2*.

25.  The Guaranty "warrants and represents to and guaranties to Purchaser that:

   a.  All accounts receivable reports and records submitted by Seller to Purchaser have been, and after the date hereof will be true, complete and correct in all respects and all financial and other reports of every nature whatsoever submitted by Seller to Purchaser shall fairly represent Seller's business as of the date such report is made;

   b.  There are, and until the termination of the Factoring Agreement and repayment in full of the Obligations … will be, no liens or security interests granted by Seller with respect to Seller's assets, except as permitted by the Factoring Agreement;

   c.  Seller has and will at all times maintain its assets insured against loss or damage … and all such policies of insurance have and will have payable endorsements in favor of Purchaser, in form and substance seasonably satisfactory to Purchaser;

   d.  All "Purchased Accounts" (as defined in the Factoring Agreement), and all reports prepared by Seller relating to such Purchased Accounts, are and will be genuine and in all respects what they purport to be […];

5

e. All Purchased Accounts shown on the statements, reports, schedules and borrowing certificates delivered in connection with the Factoring Agreement are and will be valid and subsisting and rise and will arise out of the bona fine sale of goods or the performance of services by Seller;

f. The amount of the Purchased Accounts (as defined in the Factoring Agreement) represented as owing by each account debtor is and will be the correct amount actually owing by such account debtor, as reflected in the books and records of Seller, is not disputed and is not subject to any defense, setoff, credit, deduction or contra charge;

g. Seller will at all times during the term of the Factoring Agreement employ commercially reasonable credit approval and collection procedures in connection with the Accounts;

h. Seller has and will have good title to the Purchased Accounts and the absolute right to sell and convey same to purchaser;

i. Guarantor [has] not and will not direct any other person to divert any payments from any Account Debtor or otherwise do anything to impede or interfere with the payment of the Accounts to Purchaser."

(***Ex. 2***- Guaranty, § 1(a)-(i)).

26. Marcus Treiber executed the Guaranty in his individual capacity before a notary public on August 8, 2025.

27. FBSF filed a UCC Financing Statement with the Secretary of State of Nevada UCC Division on June 9, 2025, to perfect its security interest in certain EMT Collateral, including the Accounts, contracts and contract rights, and proceeds thereof, as follows:

**6. Initial Financing Statement**

| | |
|---|---|
| **Document No.** 2025481723-9 | Lapses 6/9/2030 |
| **Filed** 6/9/2025 | |
| **Debtor** EMT HOLDINGS LLC | |
| 17131 SILVER CHARM PLACE | |
| LEESBURG VA | |
| **Secured Party** FIRST BUSINESS SPECIALTY FINANCE, LLC, A SUBSIDIARY OF FIRST BUSINESS BANK | |
| 2400 EAST DEVON AVE. | |
| DES PLAINES IL | |

28. The Factoring Agreement requires EMT to make prompt payment to FBSF following EMT's receipt of any payment on a "Purchased Account":

13.9 […] Seller shall pay to Purchaser on the next banking day following the date of receipt by Seller the amount of any payment on account of a Purchased Account.

(***Ex. 1***-Factoring Agreement § 13.9).

29. The Factoring Agreement requires EMT to submit "Supporting Documentation" in

connection with each Account:

13.10   Each Account submitted shall be an Eligible Account and Seller shall submit all Supporting Documentation in connection therewith, which Supporting Documentation shall be true, accurate and correct in all respects.

(*Ex. 1*-Factoring Agreement § 13.10).

30. The Factoring Agreement and related documents were discussed by FBSF and Marcus Treiber by telephone and were transmitted between them by wire by electronic mail.

### D.  Financial Accommodations by FBSF

31. Induced by representations and information that EMT and Marcus Treiber provided in concert with and for the benefit of Eryn Appell, FBSF began purchasing Accounts from EMT in September of 2025.

32. To induce the sale of Accounts under the Factoring Agreement, EMT, through Marcus Treiber in concert with and for the benefit of Eryn Appell, provided FBSF with Supporting Documentation, including invoices, names, email addresses, and other information of its supposed Account Debtors.

33. In reliance on the Supporting Documentation and the communications and representations made by EMT and Marcus Treiber, FBSF made the Advances to EMT (the "Advances").

34. Between September 17, 2025, and November 13, 2025, FBSF purchased various Invoices from EMT and paid EMT advances totaling $1,479,481.22 (the "Advances").

35. As of December 22, 2025, FBSF had outstanding advances of at least $1,157,745.61 that remained unpaid (the "Obligations"), not including attorney fees and other charges, including

Early Termination Fees[1] and Misdirected Payment Fees[2] that are due under the Factoring Agreement, calculated as follows:

| | |
|---|---|
| Principal Only | $1,123,695.71 |
| Wire Fees | $120.00 |
| Interest & Fees | $21,429.90 |
| Annual Facility Fee (charged 9/17/2025) | $12,500.00 |
| **Net Funds Employed (as of 12/22/2025)** | **$1,157,745.61** |

### E. Defendants' Fraud and Theft by Deception - CACI Transactions

36. **_Selling Paid Invoices._** On September 17, 2025, EMT, acting through Marcus Treiber in concert with and for the benefit of Eryn Appell, sold to FBSF certain invoices of Account Debtor CACI International, Inc. ("CACI"), knowing that CACI had already paid EMT for these invoices (the "Paid CACI Invoices") and intending that FBSF rely on intentionally false representations that the Paid CACI Invoices had not yet been paid and were eligible for factoring. A true and accurate copy of the Paid CACI Invoices is attached hereto and incorporated as **Exhibit 3**.

37. The Paid CACI Invoices totaled $503,862.56, calculated as follows:

| Paid CACI Invoices | | | | |
|---|---|---|---|---|
| 7/23/2025 | 8/21/2025 | EMT00028 | $ | 115,724.72 |
| 7/26/2025 | 8/14/2025 | EMT00029 | $ | 121,067.45 |
| 7/22/2025 | 8/21/2025 | EMT00030 | $ | 114,668.56 |
| 8/18/2025 | 9/15/2025 | EMT00031 | $ | 152,401.83 |
| | | **TOTAL** | **$** | **503,862.56** |

38. Thus, EMT, acting through Marcus Treiber in concert with and for the benefit of Eryn Appell, fraudulently induced FBSF to purchase the Paid CACI Invoices assuring payment of $503,862.56 on Accounts that EMT had already collected from CACI (the "Stolen Funds")

---

[1] The Factoring Agreement requires EMT to pay an "Early Termination Fee" if EMT terminates without sixty (60) days' notice prior to the end of a Term or if FBSF terminates due to an Event of Default. Factoring Agmt, §20. The Early Termination Fee is "two percent (2.0%) of the "Maximum Amount" of $2,500,000, or $50,000. Factoring Agmt, pp. 2-3 and §20.

[2] The Factoring Agreement requires EMT to pay a "Misdirected Payment Fee" of fifteen percent (15%) of the amount of any payment of a Purchased Account that is paid to EMT and not delivered in kind to FBSF by the following business day. Factoring Agmt, p. 3 and §6.6.

39.  Defendants have refused FBSF's demands to turn over the proceeds of the Stolen Funds to FBSF and have used such proceeds for their individual benefit. This constitutes common law fraud, theft by deception in violation of Illinois Criminal Statutes (720 ILCS 5/16-1), and an Event of Default under Section 4 and Section 17.1(a)(b) and (c) of the Factoring Agreement.

40. ***Receiving and Retaining Payments from Account Debtors on Purchased Accounts.*** After selling the Purchased Accounts to FBSF on September 17,2025, EMT, acting through Marcus Treiber in concert with and for the benefit of Eryn Appell, fraudulently received and retained payments on the Purchased Accounts, including payments totaling $395,960.16 from CACI, as follows:

| Received from CACI and Retained by EMT on Purchased Accounts | | | |
|---|---|---|---|
| Invoice Date | Payment Date | Invoice Number | Amount |
| 8/27/2025 | 9/25/2025 | EMT00032 | $179,670.20 |
| 9/10/2025 | 10/9/2025 | EMT00033 | $127,374.25 |
| 9/10/2025 | 10/20/2025 | EMT00034 | $88,915.71 |
| | | TOTAL | $395,960.16 |

41. EMT retained the payments despite its duty under the Factoring Agreement to remit such sums to FBSF within one banking day after receipt thereof. (Ex. 1-Factoring Agreement § 13.9).

42. CACI paid EMT for two of the invoices for these Purchased Accounts after FBSF had issued a Notice of Assignment to CACI on or about October 2, 2025, a true and correct copy of which is attached hereto as ***Exhibit 4*** (the "CACI-NOA").

43. The CACI-NOA informed CACI that all of EMT's Account had been sold and assigned to FBSF and that all payments should now be made payable and mailed directly to FBSF.

44. Despite having received the CACI-NOA, CACI paid EMT directly and EMT retained payments for the following two invoices totaling $216,289.96:

| CACI Paid Over CACI-NOA | | |
|---|---|---|
| 9/10/2025 | EMT00033 | $ 127,374.25 |
| 9/18/2025 | EMT00034 | $ 88,915.71 |
| | TOTAL | $ 216,289.96 |

45. ***Duplicate Invoice Numbers and Refusal to Substantiate Invoices.*** Among the invoices that EMT, acting through Marcus Treiber in concert with and for the benefit of Eryn Appell, sold to FBSF (and for which FBSF advanced funds) were two separate CACI invoices bearing the Invoice Number "EMT00035:" the first was dated August 14, 2025 in the amount of $174,567.00 ("Invoice EMT35-$174,567.00") and the second was dated October 9, 2025 in the amount of $30,724.18 ("Invoice EMT35-$30,724.18").

46. On October 20, 2025, FBSF contacted Marcus Treiber by email to attempt to schedule a call to determine why FBSF had not received any payments whatsoever from any Account Debtors; the message was not returned.

47. On October 21, 2025, still having received no payments from any Account Debtors, FBSF sent an inquiry and another copy of the CACI-NOA to CACI by email.

48. CACI informed FBSF by email on October 21, 2025, that it had paid all outstanding EMT invoices other than Invoice EMT35-$30,724.18. CACI further stated in that email:

**EMT00035** is the only invoice that has not been paid yet as it is not due yet. This invoice was dated 10/9/2025, and there seems to be a discrepancy in the date on your list as the items on this invoice are from September and October, not August as indicated.

49. On November 17, 2025, CACI paid FBSF for Invoice EMT35-$30,724.18 in the amount of $24,724.18 (representing the original invoice amount, less $6,000 in credits allowed by EMT).

50. CACI has since confirmed that it made the following payments to EMT between August 21, 2025 and November 17, 2025 for invoices dated from May 23, 2025 to September 10, 2025:

| Invoice Date | Invoice Number | Amount | Date Paid | Invoice before credit |
|---|---|---|---|---|
| 7/23/2025 | EMT00028 | $ 115,724.72 | 8/21/2025 | |
| 7/26/2025 | EMT00029 | $ 121,067.45 | 8/14/2025 | |
| 7/22/2025 | EMT00030 | $ 114,668.56 | 8/21/2025 | |
| 8/18/2025 | EMT00031 | $ 152,401.83 | 9/15/2025 | |
| 8/27/2025 | EMT00032 | $ 179,670.20 | 9/25/2025 | |
| 9/10/2025 | EMT00033 | $ 127,374.25 | 10/9/2025 | |
| 5/23/2025 | EMT00034 | $ 88,915.71 | 10/20/2025 | |
| | EMT00035 | $ 24,724.18 | 11/17/2025 | ($30,724.18) |
| | 2 Credit Memos | $ (6,000.00) | 11/17/2025 | |
| | | $ 918,546.90 | | |

51. CACI's records do not include Invoice EMT35-$174,567.00, it was not among the invoices paid by CACI, and it has not been paid to FBSF.

52. Despite multiple requests, EMT has evaded all requests for Supporting Documentation, including those related to Invoice EMT35-$174,567.00, has refused to account for payments thereof and has refused to provide any explanation for the duplicate numbering and its suspicious absence from CACI's records.

53. ***Unlawfully Misdirecting FBSF's Payments for Purchased Invoices.*** CACI pays EMT invoices through a portal that remits payments to payee bank accounts as directed by EMT. After the CACI-NOA was sent, payments through that portal were directed to flow directly to FBSF's bank account per the terms of the Factoring Agreement. The last payment received from CACI was a payment of $54,540.76 on December 2, 2025.

54. FBSF has learned that EMT, acting through Marcus Treiber in concert with and for the benefit of Eryn Appell, redirected the portal payments away from FBSF on or about December 10, 2025, to a remittance address of an unknown owner of an account at First National Bank. This explains why FBSF ceased receiving payments from CACI for FBSF's purchased invoices.

55. When questioned by CACI regarding the remittance change from FBSF to First National Bank and the obligation of CACI to pay FBSF under the CACI-NOA, Marcus Treiber responded that CACI should not pay FBSF because EMT was "trying to get away from them."

**F. Defendants' Fraud and Theft by Deception – Bogus VA Invoices**

56. On September 17, 2025, EMT, acting through Marcus Treiber in concert with and for the benefit of Eryn Appell, intentionally sold FBSF invoices ostensibly payable by The Department of Veterans Affairs totaling $322,796.11, which they knew to be contested and ineligible for payment because the work was not completed (the "VA Ineligible Invoices"). A true and accurate copy of the VA Ineligible Invoices is attached hereto and incorporated as ***Exhibit 5***.

57. When FBSF sought payment, The Department of Veterans Affairs explained that the VA Ineligible Invoices "have never been submitted" and "those services were never completed and therefore should not be submitted" and that the "period of performance has ended."

58. Defendants have refused to return FBSF's payments for these VA Ineligible Invoices despite demand from FBSF. This constitutes common law fraud, theft by deception in violation of Illinois Criminal Statutes (720 ILCS 5/16-1), and an Event of Default under Section 4 and Section 17.1(a)(b) and (c) of the Factoring Agreement.

### G. Defendants' Further Defaults

59. EMT has failed to provide FBSF the documentation required under the Factoring Agreement, including but not limited to: (i) accounts receivable agings; (ii) accounts payable agings; (iii) bank statements; and (iv) collateral reports. This failure is a further Event of Default under Section 13.2 and Section 17.1 of the Factoring Agreement.

60. Following the execution of the Factoring Agreement, two liens were recorded on the assets of EMT without the prior written consent of FBSF. This failure is a further Event of Default under Section 13.8 and Section 17.1 of the Factoring Agreement.

61. When Defendants Marcus Treiber and Eryn Appell executed the Factoring Agreement on behalf of EMT, they failed to disclose that litigation was pending against EMT for EMT's default under a financing arrangement with Suncoast Funding Group, which litigation was filed by Suncoast Funding Group in the Supreme Court of the State of New York, Case no. E2025015647 (the "Suncoast Litigation").

### H. Personal Involvement of Marcus Treiber and Eryn Appell

62. In addition to the foregoing allegations showing personal involvement of Marcus Treiber:

    a. Marcus Treiber supervises and is involved in the daily operations of EMT.

    b. Marcus Treiber is a signatory on EMT's bank accounts.

    c. FBSF had multiple and frequent contacts with Marcus Treiber, by email and telephone,

beginning in the summer of 2025 through December 2025 regarding all aspects of the factoring of EMT's Accounts.

63. In addition to the foregoing allegations showing personal involvement of Eryn Appell and concerted action with the unlawful conduct of Marcus Treiber, Eryn Appell's role as COO gave her responsibility for day-to-day operations, including financial operations and bank accounts, by which she would have known:

    a. that EMT had been paid by CACI for the Paid CACI Invoices before EMT sold them to FBSF.

    b. the change in the remittance address in the CACI payment portal, which redirected payments away from FBSF.

    c. that the work had not been completed as stated in the VA Ineligible Invoices.

    d. that she and Marcus Treiber were receiving funds into their personal bank accounts from Advances that FBSF provided to EMT.

## COUNT I
## BREACH OF CONTRACT
### (FBSF v. EMT)

64. FBSF realleges Paragraphs 1 through 63.

65. EMT has breached the Factoring Agreement by its refusal to provide monthly reports and financial statements and allow FBSF access to financial records, refusal to provide Supporting Documentation related to its Account Debtors, imposing liens on FBSF's collateral without its consent, selling to FBSF the Paid CACI Invoices for which EMT had already been paid by CACI, failing to disclose the Suncoast Litigation, refusing to account to FBSF for payments on Invoice EMT35-$174,567.00, redirecting Account Debtor payments away from FBSF, selling VA Ineligible Invoices to FBSF, and failure to pay Obligations due under the Factoring Agreement.

66. EMT has breached its warranties, representation, and covenants under the Factoring Agreement by submitting financial records and documentation that were not true and accurate and by failing to provide financial information requested by FBSF, among other breaches. (Ex. 1-Factoring Agreement, § 13).

67. EMT has suffered a material adverse change in its financial condition, as it was represented to FBSF to induce it to enter into the Factoring Agreement.

68. Due to the fraudulent conduct and misrepresentations of EMT, FBSF now deems itself insecure and has reasonable cause to believe that EMT's performance under the Factoring Agreement appears jeopardized and that the performance of the guarantor on the Marcus Treiber Guaranty also appears jeopardized.

69. EMT has thus committed "Events of Default" under the Factoring Agreement, defined to include without limitation:

a. Seller defaults in the payment of any Obligations, which payment is not made within five (5) days of the due date thereof;

b. Seller defaults in the performance of any covenant, condition or provision hereof or of any Other Agreement now or hereafter entered into with Purchaser, which default is not cured within five (5) days of the occurrence thereof;

c. warranty or representation contained herein or in any Other Agreement proves to be false or inaccurate in any way, howsoever minor and the same is not cured , within five (5) days of the date of the occurrence thereof;

d. Seller or any guarantor or the Obligations becomes subject to any Insolvency Proceeding;

e. any such guarantor fails to perform or observe any of such guarantor's obligation to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate or revoke any guaranty of the Obligations or any such guaranty shall cease to be in full force and effect for any reason whatever:

f. a material adverse change in the business or operations of Seller as determined by Purchase in its sole discretion;

g. Seller enters into any financing arrangement, whether secured or unsecured, wherein the Seller grans the lender debit authority with respect o any of Seller's bank accounts; or

h. Purchaser for any reason, in good faith deems itself insecure with respect to the prospect of repayment of performance of the Obligations, which is not cured within five (5) days of notice thereof to Seller. Notwithstanding anything to the contrary set forth herein, Seller shall not be entitled to any cure period for an Event of Default that results in (i) Purchaser not having a first lien security interest on the Collateral; or (ii) the impairment of the ongoing operations of Seller in the sole discretion of Purchaser.

(**Ex. 1**-Factoring Agreement, § 17.1).

70. Upon an Event of Default, FBSF may cease payment of the Purchase Price and further

Advances, terminate the Factoring Agreement and declare all Obligations due and payable, set off and apply the proceeds of any Account, Reserves, and Collateral, among other remedies.

71. EMT is responsible for all attorney's fees, court costs, and other expenses incurred by FBSF arising under or related to the Factoring Agreement:

26.6 <u>ATTORNEY'S FEES</u>. the actual amount of all costs and expenses, including attorneys' fees which Purchaser may incur in enforcing this Agreement and any documents prepared in connection herewith. or in connection with any federal or state insolvency proceeding commenced by or against Seller, including those (i) arising out the automatic stay, (ii) seeking dismissal or conversion of the bankruptcy proceeding or (ii) opposing confirmation of Seller's plan there under.

(*Ex. 1*-Factoring Agreement, § 26.6).

72. FBSF has suffered damages as result of EMT's breach of the Factoring Agreement, which damages are at least $1,157,745.61 as of December 22, 2025, not including interest, attorney fees, and other charges, including Early Termination Fees and Misdirected Payment Fees that are due under the Factoring Agreement.

**WHEREFORE**, FBSF prays for a judgment against EMT for compensatory damages of at least $1,157,745.61 as of December 22, 2025, not including interest, attorney fees, and other charges, including Early Termination Fees and Misdirected Payment Fees that are due under the Factoring Agreement, and other appropriate relief in FBSF's favor.

<u>**COUNT II**</u>
**BREACH OF GUARANTY**
**(FBSF v. Marcus Treiber)**

73. FBSF realleges Paragraphs 1 through 72.

74. To induce FBSF to extend financial accommodations to EMT, Marcus Treiber executed the Guaranty.

75. Pursuant to the Guaranty, Marcus Treiber absolutely and unconditionally guaranteed to FBSF prompt payment and prompt, full and faithful performance and discharge by EMT of all the terms, conditions, agreements, representations, warranties, guaranties and provisions on the part

of EMT (the "<u>Guaranteed Obligations</u>"). (***Ex. 2***, -Marcus Treiber Guaranty)

76. On or about November 4, 2025, FBSF sent written demand to Marcus Treiber for payment of the Obligations, a true and correct copy of which is attached hereto as ***Exhibit 6.*** .

77. Marcus Treiber has breached the Guaranty and the Guaranteed Obligations by failing to pay the Obligations upon demand by FBSF.

78. FBSF has suffered damages as a result of Marcus Treiber's breach of the Guaranty, which damages are at least $1,157,745.61 as of December 22, 2025, not including interest, attorney fees, and other charges, including Early Termination Fees and Misdirected Payment Fees that are due under the Guaranty.

**WHEREFORE**, FBSF prays for judgment against Marcus Treiber on Count II and for compensatory damages of at least $1,157,745.61 as of December 22, 2025, plus including interest, attorney fees, and other charges, including Early Termination Fees and Misdirected Payment Fees that are due under the Guaranty, and other appropriate relief in FBSF's favor.

<u>**COUNT III**</u>
**ALTER EGO / PIERCING THE CORPORATE VEIL**
**(FBSF v. Marcus Treiber & Eryn Appell)**

79. FBSF realleges Paragraphs 1 through 78.

80. Marcus Treiber and Eryn Appell exercised complete dominion and control over EMT and made all significant business decisions for EMT without meaningful oversight.

81. EMT is believed not to have observed corporate formalities, including without limitation failing to hold regular meetings, failing to maintain corporate minutes, resolutions, or required records of a limited liability company, and failing to adopt or follow an operating agreement.

82. Marcus Treiber and Eryn Appell commingled personal and corporate funds, including without limitation using corporate funds to pay personal expenses and depositing EMT funds into personal accounts.

83. EMT's assets were treated as the personal assets of Marcus Treiber and Eryn Appell.

84. At formation and throughout its existence, EMT was inadequately capitalized to meet its reasonably foreseeable liabilities.

85. EMT lacked sufficient assets, insurance, or reserves to satisfy debts arising from ordinary business operations.

86. EMT was a mere instrumentality and alter ego of Marcus Treiber and Eryn Appell.

87. EMT existed primarily to shield Marcus Treiber and Eryn Appell from personal liability while allowing Marcus Treiber and Eryn Appell to conduct personal business.

88. Defendants used the corporate form to perpetrate a fraud and/or promote injustice, including without limitation inducing FBSF to contract while knowing EMT could not perform, diverting corporate assets to avoid payment to FBSF, and rendering EMT judgment-proof after incurring obligations, even while COO Eryn Appell boasts of "her passion for luxury…[and] adoration for her Range Rover SUV" on EMT's website: https://www.emt-holdings.com/leadership-team/eryn-appell-chief-operating-officer.

89. .There exists a unity of interest and ownership between EMT and Marcus Treiber and Eryn Appell such that the separate personalities of EMT and Marcus Treiber and Eryn Appell no longer exist and adherence to the fiction of separate corporate existence would sanction fraud and promote injustice.

90. Accordingly, the corporate veil should be pierced and Marcus Treiber and Eryn Appell held personally liable for the obligations of EMT.

**WHEREFORE**, FBSF prays that the Court enter judgment piercing the corporate veil of EMT, hold Marcus Treiber and Eryn Appell jointly and severally liable for EMT's obligations, award compensatory damages against Marcus Treiber and Eryn Appell for compensatory damages of at least $1,157,745.61 as of December 22, 2025, plus fees, interest, early termination fees,

attorney fees, and other charges due pursuant to the terms of the Factoring Agreement, and other appropriate relief in FBSF's favor.

**COUNT IV**
**COMMON LAW FRAUD**
**(FBSF v. EMT, Marcus Treiber & Eryn Appell)**

91. FBSF realleges Paragraphs 1 through 90.

92. EMT, Marcus Treiber, and Eryn Appell committed fraud by inducing FBSF under false pretenses and misrepresentations to enter into the Factoring Agreement, by concealing financial records, selling to FBSF the Paid CACI Invoices for which EMT had already been paid by CACI, selling Invoice EMT35-$174,567.00 without any basis for repayment, redirecting Account Debtor payments away from FBSF, selling VA Ineligible Invoices to FBSF, and misusing Advances for the personal benefit of Marcus Treiber and Eryn Appell.

93. In furtherance of the scheme to defraud, EMT, Marcus Treiber, in concert with and for the benefit of Eryn Appell, knowingly made false statements of material fact with the intent to induce FBSF to enter the Factoring Agreement and make Advances, including without limitation:

a. that the Accounts submitted by EMT for purchase by FBSF were owed by existing entities and were bona fide Accounts created through goods and services performed by EMT;

b. that the Accounts submitted by EMT for purchase by FBSF were owed by existing entities and were Eligible Accounts in accordance with Section 1 of the Factoring Agreement (Ex. 1-Factoring Agreement, § 1);

c. that the Accounts submitted by EMT for purchase were owed by existing entities and met the criteria contained in § 6.2 of the Factoring Agreement (Ex. 1-Factoring Agreement, § 6.2);

d. that EMT possessed necessary Supporting Documentation evidencing that the Accounts submitted by EMT for purchase were due and payable in full to FBSF without counterclaim or offset; and

e. that the Supporting Documents and other records EMT submitted to FBSF were truthful and accurate representations related to legitimate Account Debtors and Accounts

(collectively, but without limitation, the "Factoring Misrepresentations").

94. In furtherance of the scheme to defraud, EMT, Marcus Treiber, acting in concert with and for the benefit of Eryn Appell knowingly made false statements or omissions of material fact to mislead FBSF into believing such organizations were legitimate Account Debtors with the intent to induce FBSF to purchase the Obligations and make the Advances (collectively, but without limitation, the "Account Debtor Misrepresentations" and together with the Factoring Misrepresentations, the "EMT Misrepresentations").

95. Through the EMT Misrepresentations and as part of the scheme to defraud, EMT, Marcus Treiber, and Eryn Appell intended to induce FBSF to make the Advances.

96. In reasonable reliance on the truth of the EMT Misrepresentations, FBSF entered the Factoring Agreement and made the Advances thereunder, accepted the Guaranty, and took other actions to its detriment.

97. As a result of its reasonable reliance on the EMT Misrepresentations, FBSF has incurred damages of at least $1,157,745.61 as of December 22, 2025, plus prejudgment interest at the Default Rate through judgment, attorney's fees, and costs.

98. EMT received the Advances through the wrongful and fraudulent conduct of EMT and Marcus Treiber, acting in concert with and for the benefit of Eryn Appell.

99. EMT, Marcus Treiber, and Eryn Appell each acted willfully and wantonly and each knowingly and intentionally caused the EMT Misrepresentations to be made to FBSF with a deliberate disregard to the truth, the rights of FBSF, and the risk of injury to FBSF.

100. As detailed herein, Marcus Treiber, Eryn Appell, and EMT personally enriched themselves with the Advances received through the EMT Misrepresentations and the scheme to defraud.

101. FBSF is entitled to an award of punitive and exemplary damages against EMT, Marcus Treiber, and Eryn Appell, in an amount that includes as a measure of the punitive damages the

attorney's fees, costs, and expenses incurred by FBSF in bringing this lawsuit, and an amount not less than three times the amount of actual damages suffered by FBSF to punish Defendants and to deter them and others from engaging in similar misconduct in the future.

**WHEREFORE**, FBSF prays for judgment against EMT, Marcus Treiber, Eryn Appell, jointly and severally, for:

A. at least $1,157,745.61 as of December 22, 2025, plus prejudgment interest at the Default Rate through judgment, attorney's fees, and costs.

B. punitive and exemplary damages in an amount that includes as a measure of the punitive damages the attorney's fees, costs, and expenses incurred by FBSF in bringing this lawsuit, plus an amount not less than three times the amount of actual damages suffered by FBSF;

C. alternatively, imposition of a constructive trust on all the Advances and proceeds thereof and imposition of an equitable lien on all property of EMT, Marcus Treiber, and Eryn Appell; and

D. other appropriate relief in its favor.

### COUNT V
### RICO - 18 U.S.C. § 1962(C)
### (FBSF v. Marcus Treiber & Eryn Appell)

102.     FBSF reallege Paragraphs 1 through 101.

103.     Title 18 U.S.C. § 1962(c) provides that "it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

104.     Marcus Treiber and Eryn Appell are "persons" within the meaning of 18 U.S.C. § § 1961(3) and 1962.

105.     Marcus Treiber and Eryn Appell operated EMT as a factoring fraud enterprise (the "Factoring Fraud Enterprise"), which conducted its activities in the States of Illinois, Virginia, and Nevada.

106.    Marcus Treiber and Eryn Appell conducted the Factoring Fraud Enterprise through a pattern of racketeering activity, including without limitation the following predicate acts of federal mail fraud and wire fraud in interstate commerce:

a. Repeated and continuing acts of wire fraud as described above in violation of 18 U.S.C. § 1343, by voluntarily and intentionally devising and executing a scheme to defraud Factors and other creditors, including FBSF, that included use of the interstate wire communications in furtherance of its scheme by its interstate telephone calls and regularly sending and receiving electronic transfers of funds by interstate wire; and

b. As set forth herein, the Factoring Fraud Enterprise affected and operated in interstate commerce by (i) its operations centered in the State of Virginia; (ii) its engaging in a series of financial transactions with FBSF, which is based in and operates from the State of Illinois; and (iii) its incorporation in the State of Nevada.

(the "Racketeering Activities").

107.    The schemes to defraud consisted of fraudulent activities to induce FBSF to make the Advances and provide other benefits to Defendants by means of false and fraudulent pretense, including without limitation:

a. inducing FBSF under false pretenses and misrepresentations to enter into the Factoring Agreement,

b. concealing financial records,

c. selling to FBSF the Paid CACI Invoices for which EMT had already been paid by CACI,

d. double-selling CACI Invoices to both FBSF and other purchasers, which is alleged on information and belief;

e. entering into credit facilities with other entities such as SunCoast with no intention or ability to repay, which is alleged on information and belief,

f. selling Invoice EMT35-$174,567.00 with the knowledge that it offered no basis for repayment,

g. redirecting Account Debtor payments away from FBSF,

h. selling VA Ineligible Invoices to FBSF,

i. misusing Advances to EMT for the personal benefit of Marcus Treiber and Eryn Appell, and

j. intentionally making the EMT Misrepresentations detailed above.

108. The Racketeering Activities continued for an extended period, from at least summer of 2025 through December 2025, during which Marcus Treiber and Eryn Appell used interstate wire and telephone to provide false and fraudulent information to FBSF and to receive the Advances from FBSF.

109. The numerous, continuous, and related Racketeering Activities alleged herein establish a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

110. FBSF did in fact make the Advances to EMT in reliance on the EMT Misrepresentations and Racketeering Activities and has, as a result, suffered injury and incurred damages of at least $1,157,745.61 as of December 22, 2025, plus prejudgment interest at the Default Rate through judgment, attorney's fees, and costs.

**WHEREFORE**, FBSF prays for a judgment against Marcus Treiber and Eryn Appell, jointly and severally, finding that:

A. EMT is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962;

B. The Factoring Fraud Enterprise, consisting of EMT, is engaged in, or its activities affect, interstate commerce;

C. Marcus Treiber and Eryn Appell have conducted or participated, directly or indirectly, in the Factoring Fraud Enterprise's affairs through a pattern of racketeering activity;

D. The actions of Marcus Treiber and Eryn Appell, aforesaid, have resulted in injury to the business and property of FBSF;

E. FBSF has been damaged in the amount of at least $1,157,745.61 as of December 22, 2025, plus prejudgment interest at the Default Rate through judgment, attorney's fees, and costs;

F. FBSF is entitled to judgment for all damages under 18 U.S.C. § 1964(c), including threefold its actual damages, a reasonable fee for its attorneys, costs of suit, and entry of judgment, jointly and severally, against Marcus Treiber and Eryn Appell;

G. Marcus Treiber and Eryn Appell must be ordered to disgorge all proceeds derived from any violation of 18 U.S.C. § 1962(c), including any proceeds held by any third party such as EMT; and

H. Other appropriate relief in FBSF's favor.

## **VERIFICATION**

Under penalties for perjury as provided by law, the undersigned certifies that the statements set forth in this *Verified Complaint* are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

Date:                                     FIRST BUSINESS SPECIALTY FINANCE, LLC, a Wisconsin limited liability company,

By: *Robbin Salvage*

Robbin Salvage, Vice President

Respectfully submitted,

/s/ Nancy J. Townsend

Nancy J. Townsend (#6191399)
Nicole Firlej (#6344338)
Laurie A. Martin Montplaisir (#6237625)
200 South Wacker Street, Suite 600
Chicago, IL 60606
(Tel) 312.423.9300
ntownsend@kdlegal.com
nfirlej@kdlegal.com
lmontplaisir@kdlegal.com
*Attorneys for FBSF*